642 A.2d 397

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. EMMANUEL A. BULLOCK, DEFENDANT–
RESPONDENT.

Argued February 15, 1994—Decided June 21, 1994.

*Linda K. Danielson,* Deputy Attorney General, argued the cause for appellant (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for respondent (*Susan L. Reisner,* Acting Public Defender, attorney; *Mr. Wilensky* and *James F. Anderson,* of counsel and on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

Does a suspended state trooper remain a public servant for the purposes of a criminal prosecution for official misconduct? The

Appellate Division thought not and reversed the conviction of defendant, Emmanuel Bullock. 264 *N.J.Super.* 419, 624 *A.*2d 1036 (1993). We granted the State's petition for certification, 134 *N.J.* 484, 634 *A.*2d 530 (1993), and now reverse.

–I–

Defendant became a state trooper on November 23, 1987, and was suspended on October 4, 1988, for reasons that the record does not disclose. As required by the terms of the suspension, defendant turned in all of his State Police equipment except his police identification card, which he said he had lost.

Two incidents, which occurred during defendant's suspension, give rise to this case. First, on January 9, 1989, defendant approached an alleged drug dealer outside a bar in Hackensack. According to the dealer, defendant told him that he wanted to buy some crack. The dealer left and returned shortly with the drugs. Defendant displayed a card, identified himself as a member of the "New Jersey Task Force," and told the dealer that he was under arrest.

The dealer fled, but defendant caught him and took him to a blue Ford Escort. According to the dealer, defendant placed a gun at his back and ordered him into the car, where two other men, Ronald Bullock (defendant's cousin) and Jerome Jiggets, were waiting. They told the dealer that they would drive him to the police station. Instead, they drove around for about ninety minutes while defendant repeatedly questioned the dealer about the location of his drugs and Jiggets threatened to kill or pistol-whip him. Eventually, defendant and his companions let the dealer out of the car without taking anything from him.

In a written statement given to the police, defendant claimed that the dealer had approached him, voluntarily had entered the car, and had said that he would take defendant to a "big drug dealer." Defendant admitted, however, that "he might have" told the dealer that he was a police officer and that "he could have" shown the dealer an identification card.

The second incident occurred on January 19, 1989. Hackensack Police Officer Thomas Staron received a report of three armed men in a blue Ford Escort. He stopped defendant, defendant's cousin, and Jiggets in a car meeting that description. Staron testified that defendant left the car from the passenger seat and stood before Staron with his hand inside his jacket. Not until Staron drew his gun did defendant remove his hand from the jacket. Defendant then showed Staron a State Police identification card and stated that he was a state trooper. After discovering an unlicensed BB gun in defendant's shoulder holster, Staron handcuffed defendant, and placed him under arrest. A search incident to that arrest revealed a pocket knife in defendant's jacket pocket. A search of the car revealed a starter pistol under the front seat.

In his written statement, defendant admitted that he had been carrying a BB gun when arrested and that he had shown Staron an identification card, but claimed he had informed Staron that he was a "State Trooper on suspension."

Defendant was indicted for various offenses and convicted of official misconduct, *N.J.S.A.* 2C:30–2a; possession of a gun without a permit, *N.J.S.A.* 2C:39–5b; and unlawful possession of a knife, *N.J.S.A.* 2C:39–5d. He was acquitted of various offenses, including armed robbery, *N.J.S.A.* 2C:15–1b; kidnapping, *N.J.S.A.* 2C:13–1; terroristic threats, *N.J.S.A.* 2C:12–3b; and aggravated assault, *N.J.S.A.* 2C:12–1b(4). The court sentenced defendant to seven years imprisonment on the official-misconduct conviction, with lesser concurrent sentences for the other convictions. The Appellate Division upheld the convictions for unlawful possession of a knife and a gun, but reversed the official-misconduct conviction. In reversing that conviction, the Appellate Division stated that defendant's "status as a public servant is an essential element of the offense and that the evidence did not permit a finding that he was a public servant" at the time of the two incidents. 264 *N.J.Super.* at 421, 624 *A.*2d 1036. We granted the State's petition to review the reversal of the misconduct conviction, and denied

defendant's petition for review of the unlawful-possession convictions.

–II–

*N.J.S.A.* 2C:30–2 defines official misconduct:

A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner....

Thus, the crime of official misconduct has three elements: (1) the defendant is a public servant, (2) who committed an act relating to his office, (3) with purpose to benefit himself or deprive another of a benefit. Only the first element, defendant's status as a public servant, is at issue. The Appellate Division accepted defendant's argument that he could not be convicted of official misconduct because he was suspended at the time of the incidents, and therefore was not a public servant at that time. We disagree.

*N.J.S.A.* 2C:27–1g defines "public servant" as "any officer or employee of government ... performing a governmental function...." Thus, a police officer who is not suspended is a public servant under the statute. Significantly, under the *New Jersey State Police Rules and Regulations* (Aug. 1977) (*Rules and Regulations*), suspended state troopers remain employees. *See Rules and Regulations, art.* 9, § 5. Defendant had neither resigned nor been fired at the time of his arrest. Although suspended from active duty and not receiving any pay, defendant remained on the payroll. Both the statutory definition of a "public servant" and the *Rules and Regulations* suggest that defendant, although suspended, remained a public servant.

In a variety of contexts, courts have consistently held that police officers are subject to discipline whether they are suspended, are off-duty, or are on leave. *See State v. Johnson*, 127 *N.J.* 458, 462, 606 *A.*2d 315 (1992) (reinstating indictment for official misconduct when officer was off-duty at time of illegal activity); *Ward v.*

*Keenan,* 3 *N.J.* 298, 310, 70 *A.*2d 77 (1949) (stating that police officer on leave of absence remains "subject to all of the rules and regulations of his department which are reasonably applicable in the light of the nature and purpose for which the leave is granted"); *Connell v. Board of Review,* 216 *N.J.Super.* 403, 407, 523 *A.*2d 1099 (App.Div.1987) (holding that conviction for death-by-auto, arising out of offense committed when officer was off-duty, constituted work-related misconduct); *Rivell v. Civil Serv. Comm'n,* 115 *N.J.Super.* 64, 70, 278 *A.*2d 218 (App.Div.) (stating that suspended policeman was "subject to any applicable rules and regulations" of police department), *certif. denied,* 59 *N.J.* 269, 281 *A.*2d 531 (1971); *see also State v. Rockholt,* 186 *N.J.Super.* 539, 547–48, 453 *A.*2d 258 (App.Div.1982) (rejecting officer's claims that his substance addiction was so severe he was unable to function and thus was unable to commit misconduct in office), *aff'd,* 96 *N.J.* 570, 476 *A.*2d 1236 (1984); *see generally, Murley v. Township of Raritan,* 117 *N.J.L.* 357, 358, 188 *A.* 739 (Sup.Ct.1936) (distinguishing suspension, as temporary forced withdrawal from office, from removal, as dismissal from office, and noting that "[s]uspensions are a matter of daily occurrence in the discipline of policemen"); *Paull v. Pierce,* 68 *N.J.Super.* 521, 530, 172 *A.*2d 721 (Law Div.1961) (stating suspension does not remove an officer, but merely prevents officer from performing official functions).

In *Rivell,* a suspended Newark police officer refused to obey orders to report to the police station. 115 *N.J.Super.* at 67, 278 *A.*2d 218. Consequently, he was charged with violating various departmental rules, found guilty, and discharged. *Id.* at 67–69, 278 *A.*2d 218. On appeal, Rivell claimed that "the order to report to the precinct was not a lawful order because at the time it was given [he] was not an active member of the Newark Police Department...." *Id.* at 69, 278 *A.*2d 218. Thus, he "argued an employee under suspension is not subject to any orders during the time of the suspension." *Ibid.*

The Appellate Division rejected Rivell's arguments, noting that "[a] suspended policeman remains as part of the department, for

suspension is simply a matter of discipline of the policeman while a member of the department. Therefore, he should be subject to any applicable rules and regulations." *Id.* at 70, 278 *A.*2d 218 (citation omitted).

Similarly, in *Ward*, a Newark police officer took a leave of absence to run for the city commission. 3 *N.J.* at 300, 70 *A.*2d 77. During the campaign, Ward asserted that corruption existed within the Newark police department. *Ibid.* When the Newark Police Chief requested him to furnish details, Ward refused. *Ibid.*

On his return to active service, Ward was charged with violating various departmental rules, including those pertaining to insubordination, neglect of duty, and failure to take proper police action. *Id.* at 300–01, 70 *A.*2d 77. He claimed that he was not subject to the rules because he had been on a leave of absence when he made the questioned assertions. *Id.* at 301, 70 *A.*2d 77. We rejected his contention:

> Whatever may be the status of other public officers and employees, a police officer who is granted a leave of absence is not thereby divested of all of his rights nor relieved of all of his obligations as a police officer. Neither the police officer nor the Department contemplates a complete divestiture of his status as a police officer. Thus, we conceive that a police officer on leave of absence does not lose his tenure during good behavior, is not deprived of his protection against removal, reduction, suspension, or fine, except for just cause on written complaint and after hearing, and does not forfeit his pension rights * * *. Similarly, with respect to his duties and obligations, he may not accept the benefits entirely discharged from the burdens of his employment. Hence it is our view that a police officer while on leave of absence is subject to all of the rules and regulations of his department which are reasonably applicable in the light of the nature and purpose for which the leave is granted.

[3 *N.J.* at 310, 70 *A.*2d 77 (citations omitted).]

We then analogized the leave of absence to "the off duty period enjoyed daily by every police officer, except that it extends for a longer period, subjecting him to liability for his misconduct or for his breach of rules and regulations...." *Id.* at 311, 70 *A.*2d 77 (citing *Herbert v. Atlantic City*, 87 *N.J.L.* 98, 101, 93 *A.* 80 (Sup.Ct.1915)).

As the cases illustrate, suspension is a temporary condition. Suspended police officers remain subject to departmental rules.

Here, defendant signed a form advising him of the terms of his suspension. The form identified him as a "suspended member" of the New Jersey State Police and specifically noted that he should keep his copy of the *Rules and Regulations*. His required duties included communicating weekly with his supervisor, honoring subpoenas, and attending all "official matters" relating to the division of the State Police. As a suspended member, defendant was subject to additional disciplinary action for failure to comply with these requirements. Those facts support the conclusion that defendant, although suspended, remained a state policeman, subject to the terms of *N.J.S.A.* 2C:30–2a.

■ Although not raised by defendant, we briefly address the issue whether his conduct sufficiently related to his office to satisfy the requirements of *N.J.S.A.* 2C:30–2a. Even before the enactment of the current statute, we looked to the scope of a defendant's apparent authority to determine whether an act sufficiently related to the defendant's office to constitute official misconduct.

■ For example, in *State v. Schultz*, 71 *N.J.* 590, 602, 367 *A.*2d 423 (1976), the defendant, a police officer who was a precinct clerk, used "his *de facto* authority" to give orders to others to cash a check made out to the Violations Bureau. We sustained his conviction for official misconduct, holding that "[t]he conceded circumstance that defendant's duties and authority did not in fact extend to such activities is not controlling on the question of whether they were done under color of office." *Ibid.* Similarly, in *State v. Gora*, 148 *N.J.Super.* 582, 372 *A.*2d 1335, *certif. denied*, 74 *N.J.* 275, 377 *A.*2d 679 (1977), the Appellate Division sustained the conviction of a city council member who had accepted a bribe to "fix" a drunk-driving charge. The defendant claimed that he had not committed official misconduct because his "actual duties" did not include "affecting the disposition of cases." *Id.* 148 *N.J.Super.*

at 593, 372 *A.*2d 1335. In rejecting this claim, the Appellate Division held that an official-misconduct conviction

> will be sustained if the proofs show that the [defendant's promised actions] were "apparently, or pretended to be, within official power or authority, and the money [was] taken in such an apparent or claimed capacity." It is not necessary that there be actual power or authority reposed in defendant to render [the promised] services.
>
> [*Id.* at 594, 372 *A.*2d 1335 (quoting *State v. Weleck,* 10 *N.J.* 355, 372, 91 *A.*2d 751 (1952)).]

As these cases indicate, when law-enforcement officers commit an act of malfeasance because of the office they hold or because of the opportunity afforded by that office, their conduct sufficiently relates to their office to support a conviction under *N.J.S.A.* 2C:30–2a.

We conclude that defendant's conduct in both incidents sufficiently related to his office as a state policeman. In the first incident, he identified himself as a member of the "New Jersey Task Force" and "arrested" a drug dealer. In the second, he showed his State Police identification card and told a municipal policeman that he was a state trooper. As did the defendants in *Schultz, supra,* 71 *N.J.* 590, 367 *A.*2d 423, and *Gora, supra,* 148 *N.J.Super.* 582, 372 *A.*2d 1335, defendant abused his position of apparent authority by committing acts relating to his job as a state trooper. The jury readily could have found that defendant purported to act not as a private citizen but as a state trooper in violation of the statute.

The Appellate Division reversed defendant's official-misconduct conviction because it found that he was not a public servant at the time of the underlying incidents. Hence, the Appellate Division did not reach defendant's further argument for reversal based on his acquittal of the underlying charges of armed robbery, kidnapping, terroristic threats, and aggravated assault. Because we are reversing the judgment of the Appellate Division, we remand the matter to that court to consider the unresolved issue.

So ordered.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.